UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

JACK W. HUGHES, )
)
    Plaintiff, )
)
vs. ) CV 99-PT-2223-E
)
GENERAL MOTORS )
CORPORATION, et al., )
)
    Defendants. )

## MEMORANDUM OPINION

This cause comes to be heard on defendants' General Motors Corporation ("GM") and CIM Insurance Corporation ("CIM") motion for summary judgment filed January 20, 2000.

### BACKGROUND

On July 25, 1997, plaintiff Jack Hughes ("Hughes"), a Circuit Judge for Calhoun and Cleburne Counties, Alabama, purchased a used 1991 Cadillac Sedan de Ville from Devoe Infinity in Florida, which is not a franchisee of GM. Along with the Cadillac, Hughes also purchased a Mechanical Repair Protection service contract ("MRP") issued by CIM for an additional sum of $1,315.00. CIM and Motors Insurance Corporation ("MIC") are both wholly owned subsidiaries of GMAC Insurance Holding, Inc., which is a wholly owned subsidiary of GMAC Financial Services, which is a wholly owned subsidiary of GM. See Affidavit of John A. Gressa. Before purchasing the MRP, Hughes reviewed a MRP promotional brochure, which states in part in the front of the brochure:

1

>WHAT DOES MAJOR GUARD COVER? It's as simple as this: **IF IT'S NOT ON THE VERY SHORT LIST OF WHAT'S NOT COVERED, IT'S COVERED!**
>For years, millions of Major Guard customers have known that, "From the engine to the trunk lock, if it breaks - *or even if it just plain wears out* - and it's not on the list of the few items not covered, Major Guard will help pay for the repair - **whatever it is!**"
>
>WHAT'S NOT COVERED? Maintenance services and parts, physical damage, glass, lenses, sealed beams, lightbulbs, and tires. Components not installed by the factory including cellular phones, theft deterrent systems, or air conditioning. Bumpers, sheet metal, body panels and parts. Carpet, hinges, trim, upholstery, convertible or vinyl tops, moldings or bright metal. Air and water leaks, wind noise, odors, weather-strip, squeaks, rattles, paint, rust, carburetor, throttle body assembly (except injectors), contaminated fuel system, exhaust system, catalytic converter, brake rotors, brake drums, shock absorbers, and batteries.
>
>   **EVERYTHING ELSE IS COVERED!**

(Emphasis in original). On the bottom of the last page of the brochure, it states: "This brochure provides a summary of Plan Coverages. Refer to your Coverage Agreement for contract terms, exclusions, and conditions. General Motors Corporation, GM Building, Detroit, Michigan 48202." Hughes did notice and read this part of the brochure. See Hughes depo. at 26.

The coverage agreement mailed to Hughes, postmarked January 27, 1998, states in pertinent part:

>This Agreement is between the Agreement Holder identified above [Jack W Hughes] (**"YOU"** or **"YOUR"**) and the Provider, **CIM Insurance Corporation** (**"WE," "US,"** and **"OUR"**), and includes the terms of **YOUR** Contract Registration.
>
>**DEFINITIONS**
>**"CLAIM"** refers to any **COST** for which **YOU** seek payment or reimbursement from **US** under this Agreement.
>**"COST"** refers to the usual and fair charges for parts and labor to repair or replace a covered part or perform a covered service.
>...
>**"FAILURE"** or **"FAIL"** refers to the inability of an original or like replacement

2

part covered by this Agreement to function in normal service.

**WHAT THIS AGREEMENT COVERS**
**MAJOR GUARD COVERAGE**
**WE** will pay **YOU** or a repairer the **COST** to remedy any **FAILURE, using new, used or remanufactured parts**, except as explained in the items listed under the section "SERVICES AND PARTS NOT COVERED."

...

**SERVICES AND PARTS NOT COVERED**
**Unless required in connection with the repair of a covered part, WE will not pay anything under this Agreement that is related to normal maintenance service including engine tune-up, suspension alignment, wheel balancing, filters, lubricants, engine coolant, drive belts, radiator hoses, heater and vacuum hoses, windshield wiper blades, air conditioning recharging, fluids, spark/glow plugs, brake pads, linings and shoes, and manual clutch disc, or any other maintenance service or part required to be performed or replaced as recommended by the manufacturer's Maintenance Schedule.**

**Additionally, neither rust damage nor any of the following parts or services are covered under any circumstance: sheet metal, body panels, carpet, weather-strips, lenses, sealed beams, light bulbs, tires, trim, convertible or vinyl tops, moldings, bright metal, upholstery, paint, exhaust system, catalytic converter, hinges, brake rotors, brake drums, shock absorbers, batteries, carburetor, throttle body (except injectors), correction of air and water leaks, wind noise, odors, squeaks, rattles, contaminated fuel systems, bumpers, body parts, and glass.**

(Emphasis in original). The contract is between Hughes and CIM. MIC is the administrator of the MRP in Alabama. See Affidavit of John A. Gressa.

Hughes has previously experienced other problems with the Cadillac which have been resolved. Hughes took his car to Ron Newton Cadillac in Anniston for repairs around May of 1998, where his vehicle received repairs to its right rear strut, as well as an alignment. CIM paid for this work, less the applicable deductible, pursuant to the MRP. See Hughes depo at 30-32.

In May or June of 1998, Hughes noticed that his vehicle was making strange noises and

thought that the noise originated from the transmission because the noise occurred when the car was shifting gears. Aside from the noise, the car operated normally: there was no jerking, jumping, or loss of power, and the transmission shifted normally. Hughes brought the car to Ron Newton Cadillac again. However, the service personnel failed to duplicate the noise. Hughes continued to drive the car.

In September of 1998, Hughes took his car into Ron Newton for more repairs, and those repairs were made. CIM paid for the cost of those repairs pursuant to the MRP. The service personnel also determined that the noise probably originated in the transmission, but could not determine the cause. Ron Newton refused to perform any work on the car's transmission, though, because according to one of its service personnel, the MRP would not pay for "diagnostic" work. See Hughes depo at 47-48 ("He said that they couldn't do anything with it because they wouldn't -- diagnostic because they couldn't get paid.").

Around October, Hughes began calling the customer service number provided in the brochure. As a result, a claims adjuster was sent to test drive Hughes's car. The adjuster heard the noise, but could not determine its exact cause. It is unclear exactly what Hughes was told. Hughes may have been informed that if he authorized the diagnostic work, and it revealed a covered failure, CIM, pursuant to the MRP, would pay for the diagnostic work, as well as the repair work itself. Hughes claims he doesn't recall being told by anyone that the diagnostic work would be paid for as well as the actual repair work under any set of circumstances. See Hughes depo at 49:

> Q: At this point, did you say anything to whoever it was you were talking to on the phone about what the person at Ron Newton had said that they couldn't work on it at that point?

4

>A: I think I probably did say that they couldn't – didn't know what it was.
>
>Q: But did you --
>
>A: And they couldn't get paid for doing diagnostics.
>
>Q: Did he say that he just couldn't get paid for doing solely diagnostic work?
>
>A: I think that's the way he put it.
>
>Q: But that if he found out what was wrong with it and fixed it, then that would be paid for?
>
>A: I think so.
>
>...
>
>Q: Does that sound like a fairly accurate description of what he said?
>
>A: Pretty close, yes.

See also Hughes depo at 55-56:

>Q: Did they not tell you that if you agreed to authorize the diagnostic work and that if they diagnosed whatever the problem was and that if it was covered under the service contract that they would pay the whole thing, the diagnostic and the actual repair? Do you need me to ask you that again?
>
>A: No. They did not say that. They said they would pay for the repair if it was a part — if it was a part covered under the warranty.
>
>Q: They didn't tell you that if the failed part was covered under the service contract that both the repair and the diagnostic work would be paid for under the service contract? They didn't tell you that?
>
>A: No.
>
>Q: So it was your understanding that no matter what you were going to have to pay for the diagnostic work?
>
>A: Yes.

See also Affidavit of Ronald S. Sak (MIC service representative spoke with Hughes and

5

"advised [him] that it was his responsibility to authorize the inspection and diagnosis of the transmission, but that if a failure is found, then the diagnosis is part of the repair covered failure under the GMRP."); Attachment to Sak's affidavit, claim notes from phone call with Hughes on December 11, 1998 ("Called again about noise in trns. Not in shop at tis [sic] time. Trns is shifting properly but only with noise when shifting. Adivse [sic] a/d again that it is his liab to auth diag & inspection. If a failure is found than [sic] that diag is part of the covered failure repair. Till than [sic] no repiars [sic] can be auth.").

See also Hughes depo at 57-59:

> Q: Let me ask you this – if it were stated to you, if they had – if it were your recollection that they had told you that, Judge Hughes, you go ahead and authorize I'll say the tear-down of the transmission for lack of a better word and if it, in fact, uncovers a problem that's covered by the warranty – or excuse me, by the service contract, then we'll pay for the whole thing, diagnosis and repair, but if it uncovers something that's not covered, then you are going to have to pay for the diagnosis, would you have had any objection to that way of doing things?
>
> A: Yes.
>
> Q: And tell me what objection that would have been.
>
> A: That I had a warranty that was bumper to bumper, I had a problem that was not supposed to be doing that, and it was their obligation to find out what the problem was and to correct the problem. That's the reason I purchased the warranty.

Presently, Hughes has not authorized the work, has not had the noise diagnosed, and has not had it repaired. The car continues to make the noise, but still runs.

## DISCUSSION

### A. Standard for Summary Judgment

Summary judgment may be granted based upon facts developed during the administrative proceedings, the pleadings, discovery, and supplemental affidavits if together, they show that

6

there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. Id. The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. Id. at 324. The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987).

**B. GM as a Party to this Action**

Defendants GM and CIM contend that CIM, not GM, is the sole obligor for any payments potentially required to be made pursuant to the MRP and that GM should be dismissed as a defendant in this action. This contention is supported by the MRP issued to Hughes, which states: "This agreement is between the Agreement holder identified above [Hughes] ... and the provider, CIM Insurance Corporation...." John A. Gressa swore to this fact in both his affidavit and his deposition. Plaintiff contends that the purchase form shows GM as the obligated party pursuant to a General Motors Protection Plan ("GMPP") (GMPP box checked, instead of MRP box). Gressa stated in his deposition that the checked box on the purchase form was an error made by the Devoe Infinity employee. No cases are cited by either party in support of their respective positions.

The purchase form is entitled "Contract Registration" which indicates that it is not the contract, but rather registration for entry, enrollment, or enlistment into a contract agreement. The contract, or "Coverage Agreement," is an MRP and details an Agreement between Hughes

and CIM. Because the facts clearly indicate that CIM, not GM, is the sole obligor for any potential payments to be made pursuant to the MRP, GM will be dismissed from this action.

### C. Count I - Breach of Contract

In his complaint, Hughes alleges that, because diagnostic work is not included in the list of exclusion, but diagnostic work may be excluded from coverage under certain circumstances, CIM breached the MRP. Defendants contend that they have not breached the MRP, as CIM has stood ready to perform the diagnostic upon Hughes's authorization. However, Hughes has refused to grant authorization to perform the diagnosis. Because a diagnosis is required prior to a repair, CIM has remained unable to repair any possible failures in Hughes's car.

Hughes contends that defendants have represented to him, in writing, that everything is covered under the MRP except for a few specified exclusions. Both the MRP and the brochure state, in all capital letters and in boldface, "If its not on the very short list of what's not covered, its covered!" "Diagnostic work" is not contained within the list of exclusions. Therefore, Hughes argues, diagnostic work should be included within the MRP coverage. Hughes also asserts that any ambiguities in the MRP must be construed against the drafter, defendants, and in favor of plaintiff, relying on Noell v. American Design, Inc., 764 F.2d 827 (11th Cir. 1985); and Lee v. Blue Cross/Blue Shield of Alabama, 10 F.3d 1547 (11th Cir. 1994).

Defendants assert that the plain language of the MRP is clear: CIM agrees to "pay ... the COST to remedy any FAILURE...." Defendants contend that diagnostic work does not remedy anything, rather it determines whether there is a failure to be remedied. If the diagnostic work uncovers a failure not excluded by the MRP, then CIM will pay for the repair and the diagnostic work. Because CIM does pay for diagnostic work when it is done in conjunction with a repair,

8

diagnostic work has not been included in the list of exclusions under the MRP, even though CIM will not pay for diagnostic work when it fails to uncover a failure. However, defendants contend that MIC reminds customers of this possibility prior to extensive or expensive diagnostic work in order to avoid any misunderstanding as to which party bears the responsibility for the cost of the diagnostic work under the MRP.

The list of exclusions includes both services and parts. It seems a diagnostic test falls into the general category of services as it is a service to be performed, but includes no particular parts. Diagnostic tests are mentioned nowhere in the brochure or the MRP. Diagnostic tests are both covered and not covered by the MRP, depending upon the circumstances. So its exclusion from the list of exclusions was not wholly false. However, both the brochure and the MRP use mutually exclusive/inclusive phraseology, i.e. if an item is not excluded then it's included, when at least one item, diagnostic testing, may fall within either category. Additionally, the MRP clearly states that it covers only repairs for failures. It is undisputed that a diagnostic test does not remedy or repair a failure. This court concludes that the contract is ambiguous. The motion will be denied as to the breach of contract claim.

**D. Count Two - Fraud**

Defendants contend that Hughes cannot make out a claim of fraud because no false representations were made to him, and because he has not been damaged. First, defendants assert that diagnostic work is included under the MRP under certain circumstances, so the exclusionary list is a true statement. Second, defendants assert that Hughes is not damaged as he is still driving the car, has not paid anyone to fix it or diagnose the noises, and the car is still running.

9

Plaintiff asserts that defendants represented that the service contract was "bumper to bumper" and excluded only certain specific items. However, Hughes asserts that diagnostic tests are excluded from coverage even though they are not included on the exclusionary list, in contradiction to the MRP. Second, Hughes asserts that his injury is contingent and, as of yet, unrealized. Nonetheless, he argues that he has suffered an injury in that the value of his car has depreciated because of the noise.

Alabama Code § 6-5-101 (1975) states:

Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

The Alabama Supreme Court has interpreted this statute to require "(1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who must be damaged as a proximate result." Earnest v. Pritcheett-Moore, Inc., 401 So.2d 752, 754 (Ala. 1981) (citing International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala. 1977)).

The Alabama Supreme Court has laid out the following general tenets regarding fraud. "[I]f one willfully conceals and suppresses such [material] facts, and thereby leads the other party to believe that the matters to which the statement may relate are different from what they actually are, he is guilty of fraudulent concealment." Deupree v. Ruffino, 505 So.2d 1218, 1222 (Ala. 1987) (quoting American Bonding Co. v. Fourth National Bank, 91 So. 480 (Ala. 1921) (quoting 12 R.C.L. §§ 70, 71)). "It is fundamental that all persons are under a duty not to fraudulently misrepresent material facts to persons with whom they have business dealings." Ringer v. First Nat'l Bank of Stevenson, 281 So.2d 261, 267 (Ala. 1973). "[A] false representation, even if made by mistake or innocently, is a legal fraud." Hall Motor Co. v. R. W. Furman, 234 So.2d

10

37, 41 (Ala. 1970); see also Smith v. Reynolds Metals Co., 497 So.2d 93, 95 (Ala. 1986) ("An innocent misrepresentation is as much a legal fraud as an intended misrepresentation and the good faith of a party in making what proves to be a material misrepresentation is immaterial as to the question whether there was an actionable fraud if the other party acted on the misrepresentation to his detriment). However, an "innocent misrepresentation will not support an award of punitive damages." Winn-Dixie Montgomery, Inc. v. Henderson, 353 So.2d 1380, 1383 (Ala. 1977) (punitive damages only awarded with showing of maliciousness or oppressiveness).

Specifically, "for a statement regarding a future event to constitute fraud, there must be circumstances present tending to show an actual intent to deceive at the time the representation is made." George v. Federal Land Bank of Jackson, 501 So.2d 432, 435(Ala. 1986) (citing Ringer, 281 So.2d 261). In this case, there are no circumstances tending to show an intent on the part of defendant to deceive the plaintiff at the time plaintiff purchased the car and the MRP.

As to the issue of damages, the "plaintiff must show that he has suffered an actual pecuniary loss as the result of the fraud." Ringer, 281 So.2d at 266. Damages must be in the form of actual and resulting damages which proximately resulted from the defendant's actions. See P & S Business Machines, Inc. v. Olympia U.S.A., Inc., 707 F.2d 1321, 1323-24 (11th Cir. 1983) (lost profits may be relevant). Plaintiff cites Pihakis v. Cottrell, 243 So.2d 685 (Ala. 1971), in support of his contention that he has suffered damages. In Pihakis, the Alabama Supreme Court held that damage under a claim of fraud was satisfied where the plaintiff, because of the fraud, did not receive clean title to an automobile. The defendants in that case cast a cloud on plaintiff's title of record. However, in this case there is no cloud on plaintiff's title to the car.

The car is still running, albeit with more noise. Hughes has arguably suffered no damages and therefore fails to make out a claim for fraud.

### E. Count Three - Breach of Magnuson-Moss Warranty Act

Defendants assert, as an initial matter, that plaintiff has incorrectly identified the MRP as a "warranty" under the Magnuson-Moss Act (the "Act"), and that it is actually a "service contract" under the Act. As such, defendants contend that the MRP is not misleading, especially considering Hughes's education and career. Plaintiff concedes that the MRP is a service contract rather than a warranty under the Act, but that it is still misleading. The parties cite no cases in support of their respective positions.

The Act states in pertinent part:

> § 2306. Service contracts; rules for full, clear and conspicuous disclosure of terms and conditions; addition to or in lieu of written warranty
>
> (a) The Commission may prescribe by rule the manner and form in which the terms and conditions of service contracts shall be fully, clearly, and conspicuously disclosed.
>
> (b) Nothing in this chapter shall be construed to prevent a supplier or warrantor from entering into a service contract with the consumer in addition to or in lieu of a written warranty if such contract fully, clearly, and conspicuously disclosed its terms and conditions in simple and readily understood language.

15 U.S.C. § 2306. No regulations have been promulgated addressing the drafting and language of service contracts in general. There is virtually no case law on this matter, and none that directly relates to this case. The plain language of the statute does not mention the education or professional background of the consumer. In whole, the brochure and MRP are clear and easily understandable. The only question is whether the lack of clarification regarding diagnostic work renders the MRP in violation of 15 U.S.C. § 2306. This court will not grant the motion as to this

claim at this time.

**F. Count Four - Bad Faith**

Defendants contend that plaintiff cannot meet the basic elements of this claim. First, he cannot show that CIM breached the MRP. Second, he cannot show that CIM intentionally refused to pay a claim submitted to it or that CIM lacked any reasonably legitimate or arguable reason for its alleged refusal. Plaintiff argues that a question of fact remains as to whether defendants had any arguably legitimate basis to refuse coverage and should be left for the jury.

The Alabama Supreme Court has laid out the following elements of an action against an insurance company for bad faith refusal to pay a claim:

> (a) an insurance contract between the parties and a breach thereof by the defendant;
> (b) an intentional refusal to pay the insured's claim;
> (c) the absence of any reasonably legitimate or arguable reason for that refusal ...;
> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
> (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

Loyal American Life Ins. Co., Inc. v. Mattiace, 679 So.2d 229, 234-35 (Ala. 1996) (quoting National Security Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982)). "The burden on a plaintiff in a bad faith case is a very heavy one." Independent Life & Accident Ins. Co. v. Parker, 449 So.2d 233, 237 (Ala. 1984) (citing National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala. 1982)); see also Thomas v. Principal Financial Group, 566 So.2d 735, 732 (Ala. 1990).

The parties do not discuss the issue of whether the service contract is an insurance contract as required for a bad faith refusal to pay claim. The Alabama Supreme Court discussed

13

this issue in <u>Schoephlin v. Tender Loving Care Corp.</u>, 631 So.2d 909 (Ala. 1993). In that case, the plaintiff purchased from the defendant a Mechanical Failure Service Contract, which described various coverage plans, contained specific instructions regarding the proper procedure to file a claim, and limitations of coverage. The Court held that such a contract was an insurance contract for the purposes of the tort of bad faith. The service contract in this case is very similar in all relevant respects to the contract in <u>Schoelphlin,</u> and so this court concludes that the contract at issue is an insurance contract for the purposes of plaintiff's bad faith claim.

Even assuming that there has been a refusal to pay, the issue is clearly reasonably debatable as to whether there has been a covered "failure."

### G. Conclusion

Based on the foregoing, defendants' motion for summary judgment will be denied, except as to plaintiff's claims of fraud (Count Two) and bad faith (Count Four). Defendants' motion to dismiss GM as a defendant to this action will be granted.

This ___ day of March, 2000.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

14